AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
AUG 07 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **19MJ3311**
One rose gold iPhone seized as line item 3 under )
FPF No. 2019250400110801 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960 | Importation of a Controlled Substance; |

The application is based on these facts:

See attached Affidavit of Special Agent Jacob Schneeberger

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Jacob Schneeberger, HSI
Printed name and title

Sworn to before me and signed in my presence.

Date: 8/7/19

_____
Judge's signature

City and state: San Diego, CA

Hon. Mitchell D. Dembin
MITCHELL D. DEMBIN
U.S. MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jacob R. Schneeberger, Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

One rose gold iPhone seized as line item 3 under FPF No. 2019250400110801 **(Target Device)**, described in Attachment A (incorporated herein by reference); seized from Claudia MADRIGAL De La Cruz on April 11, 2019, incident to her arrest for importation of Methamphetamine at the San Ysidro, California Port of Entry (POE) and which is currently in the possession of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, CA 92101 (Seized Property Vault).

2. I seek authority to search the Target Device for evidence from December 31, 2018, through April 11, 2019 of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960, as described in Attachment B (incorporated herein by reference.)

3. The information contained in this affidavit is based upon my experience and training, and in consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times and amounts are approximate.

//
//
//

## EXPERIENCE AND TRAINING

4. I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been employed by ICE/HSI since January of 2016. My duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. I am a graduate of the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, GA. I have received basic training in conducting narcotics smuggling investigations and the enforcement of numerous Immigration and Customs laws within the United States. Prior to my employment with HSI, I was employed as a full-time, sworn federal agent with the United States Border Patrol since January 2003, having graduated from the USBP Basic Border Patrol Training Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. The 20-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21 United States Code. My training has also included the use of cellular and digital telephone and other electronic devices used by narcotics smugglers in the normal course of their illicit activities.

5. In the course of my duties, I have worked as the case agent, directing specific drug-related investigations. I have also worked as a surveillance agent and observed and recorded movements of individuals trafficking in drugs and of those suspected of trafficking in drugs. Additionally, I have participated in the execution of numerous search warrants. I have initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute and the importation of controlled substances. I have interviewed defendants, witnesses and informants relative to the illegal trafficking of controlled substances. Through these experiences, I have gained a working knowledge and insight into the normal operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at San Diego international ports of entry.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, portable radios and GPS devices to maintain communication and location information with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of controlled substances, such as methamphetamine and cocaine. Typically, load drivers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to, during and following the crossing of the narcotic load, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Narcotics smugglers and their organizations use cellular, digital, and satellite telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular, digital, and satellite telephones.

7. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. This statement is made in support of an application for a warrant to search a cellular telephone that is believed to contain evidence of violations of 21 U.S.C. §§ 952, 960.

8. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to federal agents regarding this investigation. Instead it contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, upon conversations with other Homeland Security Investigations Special Agents, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, I am also aware that:

    a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g. The use of cellular telephones by conspirators or drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

### A. The Arrest

12. On April 11, 2019, at approximately 5:33 a.m., Claudia Aide MADRIGAL De La Cruz ("MADRIGAL"), a United States citizen, applied for admission into the United States through the San Ysidro Port of Entry (POE) in California. MADRIGAL was the driver, sole occupant, and registered owner of a grey 2013 Honda Civic bearing California plate 7BIC978 ("the vehicle"). Customs and Border Protection Officer (CBPO) R. Serrano was assigned to vehicle primary lane #16. MADRIGAL approached the booth and presented a U.S. Passport card to CBPO Serrano. When officer Serrano asked MADRIGAL where she was going, she stated that she was going to work in National City, California. Officer Serrano asked MADRIGAL if she worked every day, and MADRIGAL responded in the affirmative. CBPO Serrano noticed that MADRIGAL's crossing history did not show daily crossings. Officer Serrano obtained a negative customs declaration from MADRIGAL and proceeded to conduct primary vehicle inspection. When CBPO Serrano opened the trunk, he noticed anomalies in the passenger side rear quarter panel.

13. CBPO J. Castilla responded to the primary booth with his assigned Narcotics Human Detector Dog (NHDD). The NHDD alerted to an odor emanating from the passenger's side door seam. The vehicle was screened in the Z-Portal and anomalies were discovered in the doors, quarter panels, and rear bumper of the vehicle. CBPO Macisaac pried open the driver's side rear quarter panel and discovered plastic-wrapped packages inside the natural void. One of the packages was removed and probed, revealing white crystal substance that tested positive for methamphetamine.

14. During further inspection of MADRIGAL's vehicle, U.S. Customs and Border Protection Officers found and seized seventy-nine (79) packages of methamphetamine. CBPOs removed 5 packages from the driver's side rear quarter panel, 11 packages from the passenger's side rear quarter panel, 17 packages from the rear bumper, 14 packages from the passenger's side rear door, 13 packages from the passenger's side front door, 8 packages from the driver's side rear door, and 11 packages from the driver's side front door. The total weight of the packages was approximately 80.86 pounds (36.68 kilograms).

15. A subsequently prepared DEA laboratory report confirmed that the packages contained 35 kilograms of actual methamphetamine.

16. Officers placed MADRIGAL under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance. The **Target Device** was seized from MADRIGAL subsequent to her arrest. No prior attempts to download the **Target Device** have been made.

17. During MADRIGAL's patdown, CBPOs discovered a small personal-use amount of a white crystalline substance and a make-shift pipe. Both items were photographed and images have been produced in discovery. The substance tested positive for characteristics of methamphetamine, but because of the small quantity, the substance was consumed entirely during testing. The make-shift pipe was declared abandoned and destroyed on site.

18. MADRIGAL is charged with importation of a controlled substance (methamphetamine) in violation of Title 21, United States Code sections 952 and 960 in the Southern District of California in case number 19-CR-1595-W. A motion hearing in this case is set for August 19, 2019, in front of the Honorable Thomas J. Whelan.

**B.   MADRIGAL's Statement**

19. On April 11, 2019, at approximately 9:30 a.m., MADRIGAL was advised of her *Miranda* rights and elected to make a statement. MADRIGAL stated she lived in National City, California with her mom and sister, and was employed by Walmart on

Highland St. in National City, California. MADRIGAL stated she has owned the Honda Civic for about a year and was paying approximately $349 U.S. dollars a month for it.

20. MADRIGAL claimed that on the morning of her arrest, she was coming from her brother's house in Tijuana, Mexico and heading to her house in National City, California. MADRIGAL claimed that her brother, Gustavo Madrigal, cannot cross the border because he was previously deported. MADRIGAL stated that her children are with her brother in Tijuana, because he is watching them over their two-week spring break.[1]

21. MADRIGAL claimed that her brother borrowed the Honda the day before around 4:00 P.M. to take out his girlfriend. The next time MADRIGAL saw the Honda was the following morning, at 3:30 A.M., when it was parked in the street near her brother's house. MADRIGAL then drove it to the San Ysidro Port of Entry.

22. MADRIGAL stated she planned to go to her National City apartment and park the Honda in a parking space in front of a multi-unit (4) single residence. She was going to sleep for a few hours before going to work. She lives in the bottom unit and can see one of the parking spots designated for her apartment.

23. MADRIGAL was asked if she thought her brother put the narcotics in the car. In response, she said, "That's what comes to my mind." MADRIGAL did not know how her brother would retrieve the drugs from her vehicle.

24. MADRIGAL stated she is a casual methamphetamine user and uses once or twice a week. She claimed that the small bindle of methamphetamine found on her person at the time of her arrest by one of the CBPO was given to her by her brother.

25. MADRIGAL was offered to make a phone call to tell someone about her arrest and make arrangements to watch her children, but she declined. When asked for her

---

[1] According to family members who were interviewed, MADRIGAL's children are enrolled at John A. Otis Elementary School in National City. The schedule on the National School District website indicates that spring break for the 2019 school year was from March 25, 2019, to April 5, 2019.

brother's phone number, she said he does not have a phone and she does not know his girlfriend's phone number. MADRIGAL declined to give agents the passcode to her phone.

### C. Interviews with MADRIGAL's Sisters

26. On July 26, 2019, agents interviewed one of MADRIGAL's older sisters, Oralia Odle. Oralia explained that at the time of MADRIGAL's arrest, MADRIGAL, her two children, Oralia and her child, and MADRIGAL and Oralia's mother were living together in an apartment in National City.

27. Oralia told the agent that MADRIGAL had an apartment in Tijuana, and that is where she stayed when in Mexico. Oralia confirmed that she and MADRIGAL have a brother named Gustavo who was previously deported and who now lives in Mexico. According to Oralia, Gustavo stayed with MADRIGAL in Tijuana. It was not Gustavo's place, but MADRIGAL was renting it and letting Gustavo live there.

28. Oralia was surprised to hear that Gustavo allegedly borrowed MADRIGAL's car the day before the arrest and returned it late at night. Oralia explained that it was "hard to believe" this unusual story because Gustavo doesn't know how to drive. Oralia stated that she and MADRIGAL have two brothers who live in Mexico, and neither of the two knew how to drive and were scared to drive. Oralia also said Gustavo is an alcoholic and was asking for money from his family to travel to Colima, to see one of his daughters.

29. Oralia thought MADRIGAL needed to be drug tested. She noticed in the last year MADRIGAL had lost weight rapidly and was looking pale.

30. On July 26, 2019, agents also conducted a telephonic interview of MADRIGAL's older sister Yulianneth Madrigal-Cortez ("Julie"), who lives in Winchester, CA. Julie stated that MADRIGAL was renting a two-bedroom apartment in Tijuana around the time of her arrest. She would rent a room to her brother Gustavo. Gustavo had been staying at the apartment for a month or two before MADRIGAL was arrested.

31. On around April 15, 2019, Gustavo messaged Julie to tell her that MADRIGAL left for work a few days ago but she had not returned. He said MADRIGAL's oldest child was left with him at the Tijuana apartment. Gustavo said he was worried

9

because they had no food and Julie should come pick up her nephew. Julie and Oralia then went to pick up their nephew at the apartment. When they arrived at the apartment, they realized MADRIGAL had dropped off her other son with his father, Juan Martinez, who also resides in Tijuana.

32. Julie wasn't sure if MADRIGAL was working at the time of her arrest. When MADRIGAL went missing (at the time of her arrest), Julie checked MADRIGAL's mail and saw something that suggested MADRIGAL had quit her job at Walmart. MADRIGAL had kept it to herself that she had quit her Walmart job. The family thought maybe she had recently cut back her time at Walmart, but the mail they found seemed to indicate she had quit her job. (A handwritten draft of a resignation letter from Walmart was found among MADRIGAL's property at the time of her arrest.)

33. Julie was also caught off guard when she heard that MADRIGAL claimed Gustavo had borrowed the car the day before her arrest, because Julie didn't think Gustavo knew how to drive.

**D.     Crossing History**

34. A copy of the California DMV registration found in the vehicle at the time of arrest lists Claudia A. MADRIGAL DELACRUZ as the registered owner of the Honda. The registration was issued on November 19, 2018. A review of MADRIGAL's crossing history in the smuggling vehicle indicates that she crossed from Mexico into the United States in the Honda approximately 75 times since December 31, 2018, before her arrest on April 11, 2019.

35. Although MADRIGAL was not crossing the border every single day, on several occasions, MADRIGAL crossed twice in the same day. For example, on Wednesday, February 6, 2019, MADRIGAL drove the Honda from Mexico at the San Ysidro POE at 6:25 a.m. and then crossed in a different car at 11:42 p.m. On Tuesday, March 5, 2019, Madrigal crossed in the Honda at San Ysidro at 6:51 a.m. and then again (in the Honda) at 5:19 p.m. An hour later, at 6:16 p.m., the Honda crossed back into Mexico.

36.     MADRIGAL's personal crossing history since December 31, 2018, reveals that she crossed into the United States from Mexico as a pedestrian at San Ysidro Port of Entry on March 2, 2019, and also crossed in another car on three occasions.

37.     Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that the **Target Device** was used to coordinate the importation of methamphetamine into the United States.  Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can be used as a Global Positioning Device (GPS) by Drug Trafficking Organizations (DTO's) to track the location of smuggled drugs in real-time.  The cellular/mobile telephone may be concealed within natural voids or aftermarket compartments within a vehicle used for drug smuggling.  The GPS information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.

38.     In addition, I know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Device** may identify the persons involved in narcotics trafficking activities, including MADRIGAL. Furthermore, it is likely the **Target Device** may contain incriminating information pertaining to the smuggling event.  Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of MADRIGAL, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**.

39.     Finally, I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement.  This planning often includes

coordination on crossing the border to develop a crossing history or pattern. In my professional experience, narcotics trafficking activities involve planning and coordination in the weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their cargo. In this case, MADRIGAL is the registered owner of the vehicle. The current registration card was issued on November 19, 2018. MADRIGAL crossed in the vehicle from Mexico into the United States approximately 75 times between December 31, 2018, and the day of her arrest on April 11, 2019. MADRIGAL blamed her brother for putting the drugs in the vehicle. According to witness interviews, MADRIGAL's brother had been staying with her in Tijuana for approximately one or two months prior to MADRIGAL's arrest on April 11, 2019. The evidence supports that probable cause exists to search the **Target Device** for information dating back to December 31, 2018. This date is approximately three and a half months prior to MADRIGAL's crossing in the vehicle that lead to her arrest.

## METHODOLOGY

40. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions

for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

41. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

42. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

43. Based on all of the facts and circumstances described above, there is probable cause to conclude that the **Target Device** was used to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

44. Because the **Target Device** was seized during the investigation of MADRIGAL's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by MADRIGAL continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from December 31, 2018, through April 11, 2019.

45. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the

items described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Jacob R. Schneeberger
Special Agent

Subscribed and sworn to me before this ___7th___ day of August, 2019.

_____
The Honorable Mitchell D. Dembin
United States Magistrate Judge

14

## **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

One rose gold iPhone seized as line item 3 under FPF No. 2019250400110801;

("TARGET DEVICE")



currently in the possession of the Department of Homeland Security, Homeland Security Investigations, 880 Front Street, Suite 3200, San Diego, CA 92101 (Seized Property Vault).

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 31, 2018, up to and including April 11, 2019.

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States,' such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.